## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| R.C., an individual, | |
| Plaintiff, | Case No. 22-cv-2690 |
| v. | **JUDGE** _____ |
| | Related Cases: No. 19-cv-849 |
| CHOICE HOTELS INTERNATIONAL, | No. 21-cv-5022 |
| INC., SIX CONTINENTS HOTELS, INC., | No. 21-cv-4933 |
| AND HOLIDAY HOSPITALITY | No. 21-cv-4934 |
| FRANCHISING, LLC | No. 21-cv-4935 |
| | No. 22-cv-1924 |
| Defendants. | No. 22-cv-2682 |

**DEMAND FOR JURY TRIAL**

## COMPLAINT

COMES NOW, the Plaintiff R.C. ("Plaintiff" or "R.C."), by and through her undersigned

counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1.      Plaintiff R.C. is a survivor of human sex trafficking.

2.      R.C.'s life story reads like a tragedy wherein she was forced to endure violence,

trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

3.      As a young woman, R.C. met a person that groomed her into trafficking. Ultimately

that person-her trafficker-came to control every aspect of her life. The defining factor of the

relationship between R.C. and her trafficker, was that her trafficker and another trafficker forced

her to have sex with men for money.

4.      R.C. was trafficked in Defendants'[1] hotels in Ohio. R.C. and or her trafficker rented hotel rooms for one purpose—a location to engage in sex trafficker.

5.      At Defendants' hotels, R.C. was forced to engage in sex with many men every day. Every new customer was another instance R.C. was forced to have sex against her will—that is to say, R.C. was raped multiple times per day by multiple men when she stayed at Defendants' hotels.

6.      R.C.'s traffickers forced her onto Defendants' property where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse.

7.      At some point, R.C. was able to escape the grasps of her trafficker and the prison of Defendants' hotel rooms.

8.      R.C. has spent a considerable amount of time attempting to regain the life that was stripped away from her as a result of her trafficking.

9.      R.C. brings this lawsuit in an attempt to hold the Defendants that imprisoned her, accountable for their participation in her trafficking.

## OVERVIEW OF TRAFFICKING

10.      A significant portion of all sex trafficking in the United States of America occurs within the hospitality industry at hotels and motels.

11.      For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. While trafficker indiscreetly paraded throughout hotels, while hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from their trafficking ventures.

---

[1] Throughout this Complaint, when Plaintiff refers to "Defendants," that statement is alleged as to all Defendants named in this action. In the instances when Plaintiff alleges a fact as to only one Defendant, or some number of Defendants less than the total, the Complaint clearly names the Defendant to which the allegation is made.

12.     Defendants Choice Hotels International, Inc. ("Choice"), Six Continents Hotels Inc. ("Six Continents"), and Holiday Hospitality Franchising, LLC ("Holiday Hospitality") (collectively "Defendants") knew and have known for decades that sex trafficking repeatedly occurs under their brand flags.

13.     Rather than taking timely and effective measures to thwart the human trafficking epidemic through declining to rent rooms for trafficking and turning down millions of dollars in profits, Defendants chose to do almost nothing and ignore the sex trafficking on their properties. Defendants profited from every room rented.

14.     The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[2] However, traffickers aren't the only profiteers. The hotel industry, including Defendants, makes millions from participating in ventures by engaging in sex trafficking through renting rooms where victims are sexually exploited night after night. Hotels and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

15.     The hotel industry ignored human trafficking on their premises and thereby enable human trafficking in the United States to flourish.

16.     Defendants and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at the Defendants' hotels worldwide and at their own properties. Defendants and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by, among others, the Polaris project created for the use of the hospitality industry.

---

[2] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

17.     The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Defendants and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite:  continuing with business as usual, so that Defendants and all industry participants continue to profit millions from participating in a venture by renting rooms for human trafficking.

18.     Defendants' decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of R.C. on their properties.

19.     R.C., a survivor of sex trafficking, brings this action for damages against Defendants pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595. Each Defendant, knowingly benefitted from participation in a commercial business venture that it knew or should have known to be engaging in sex trafficking acts in violation of 18 U.S.C. § 1591(a).

## PARTIES

20.     Plaintiff R.C.is a natural person and a resident and citizen of Ironton, Ohio.

21.     Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

a.     Due to the sensitive and intimate nature of the issues, Plaintiff R.C. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[3]

---

[3] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the

b.   Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[4] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[5] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[6]

c.   Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d.   Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[7]

e.   Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply

---

party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[4] Fed. R. Civ. P. 10(a).

[5] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[6] Fed. R. Civ. P. 26(c).

[7] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

22.     **Defendant Choice Hotels International, Inc.** ("Choice") is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees.  Choice is a Delaware corporation with its headquarters in Rockville, Maryland.

23.      Choice maintains a registered agent in Ohio, and it can be served through its registered agent, United States Corporation Company, at 50 West Broad Street, Suite 1330, Columbus, Ohio 43215.

24.     Choice owns, supervises, manages, controls, operates, the brand Econolodge by Choice.

25.     Econolodge by Choice is classified as a value brand hotel.

26.     Choice owns, supervises, manages, controls, and/or operates the Econolodge located at 79 Rothrock Rd, Akron, Ohio 44321.

    a.  Econolodge by Choice is a Choice Hotels International, Inc. branded property.[8]

    b.  Choice employees work throughout the Akron Econolodge by Choice. Choice employees work jobs including front desk and housekeeping. Choice is the principal with control over nearly every element of operations at the Akron Econolodge by Choice. Choice is liable, either directly, vicariously, or

---

[8] *Our Brands*, CHOICE HOTELS, https://www.choicehotels.com/about/brands (last visited Jun. 9, 26 2022).

indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the Akron Econolodge by Choice where R.C. was trafficked. Choice has an actual and apparent agency relationship with the physical property owner of the Akron Econolodge by Choice as to establish vicarious liability.

c. Choice controlled and dictated the actions and inactions of the Akron Econolodge by Choice through highly specific and detailed brand standards, policies and procedures.

d. Choice knowingly benefited, or received something of value, from its commercial business venture at the Econolodge through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where R.C. was trafficked, as well as in maintaining a positive public image for the Econolodge brand.

e. Choice is subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, such as the Econo Lodge, contracting to supply services in Ohio. Choice has derived substantial revenue from services rendered in Ohio, has caused injuries to R.C. in Ohio, and profited from a commercial business venture which unlawfully permitted criminals to sell R.C. for commercial sex at the Econo Lodge in Ohio.

27. **Defendant Six Continents Hotels Inc.** ("Six Continents") is the ultimate parent company for a United Kingdom incorporated corporation InterContinental Hotels Group plc

("IHG") in the United States. IHG manages the brands of approximately 5,600 hotels throughout almost 100 countries. Defendant Six Continents is responsible for all brand standards for IHG brand hotels in the United States. Defendant Six Continents also owns, operates, or otherwise manages the software program for making reservations at IHG brand hotels. Defendant Six Continents may be served with service of process by serving its registered agent, The Corporation Trust Company Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

28.     **Defendant Holiday Hospitality Franchising, LLC** ("Holiday Hospitality") is a wholly owned subsidiary of IHG. Holiday Hospitality is a Delaware corporation and maintains a registered agent in Ohio, and it can through its registered agent, Corporation Service Company, 50 West Broad Street, Suite 1330, Columbus, Ohio 43215.[9]

29.     IHG Defendants[10], own, supervise, manage, control and/or operate the Holiday Inn by IHG.

30.     Holiday Inn by IHG is classified as a value brand hotel.

31.     IHG owns, supervises, manages, controls, and/or operates the Holiday Inn Express & Suite located at 898 Arlington Ridge E, Akron, OH 44312 ("Holiday Inn").

      a.  IHG Defendants own and control the Akron Holiday Inn and the Holiday Inn by IHG is an IHG branded property.[11]

      b.  IHG employees work throughout the Akron Holiday Inn by IHG. IHG employees work jobs including front desk and housekeeping. IHG is the principal with control over nearly every element of operations at the Akron Holiday Inn by IHG. IHG is liable, either directly, vicariously, or indirectly

---

[9] Defendants Six Continents and Holiday Hospitality are referred to herein as the "IHG Defendants or IHG."
[10] All actions and inactions of Six Continents and Holiday Hospitality are actions or inactions of IHG. Six Continents and Holiday Hospitality is the same as IHG Corporate.
[11] *Our Brands*, IHG, https://www.ihg.com/content/us/en/about/brands (last visited Jun. 15, 2022).

through an agency relationship, for the acts and/or omissions of the employees at its branded hotels, including the Akron Holiday Inn where R.C. was trafficked. IHG has an actual and apparent agency relationship with the physical property owner of the Akron Holiday Inn by IHG so as to establish vicarious liability.

c.  IHG controlled and dictated the actions and inactions of the Akron Holiday Inn by IHG through highly specific and detailed brand standrads, policies and procedures.

d.  IHG Defendants knowingly benefited, or received something of value, from its commercial business venture at the Holiday Inn through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where R.C. was trafficked, as well as in maintaining a positive public image for the Holiday Inn brand.

e.  IHG Defendants are subject to the jurisdiction of this Court because it regularly conducts business in Ohio, including through the operation of numerous hotels in Ohio, such as the Holiday Inn, contracting to supply services in Ohio. IHG Defendants have derived substantial revenue from services rendered in Ohio, has caused injuries to R.C. in Ohio, and profited from a commercial business venture which unlawfully permitted criminals to sell R.C. for commercial sex at the Holiday Inn in Ohio.

## JURISDICTION AND VENUE

32.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and under 18 U.S.C. § 1595 because this action arises under the laws of the United States.

33.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1391(d).

34.    Pursuant to Southern District of Ohio Local Rule 3.1(b), this case is related to Case Nos. 2:2021-cv-04935, 2:2019-cv-00849, 2:2021-cv-04933, 2:2021-cv-04934, 2:2022-cv-01924, 2:2021-cv-05022, 2:2022-cv-02682, and 2:2022-cv-02683, currently pending before Chief Judge Algenon L. Marbley.

## FACTUAL BACKGROUND

### INTRODUCTION

35.    R.C. brings her claims against major hotel brand corporations for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a).

36.    Defendants are complicit in the world's fastest growing crime.[12]

37.    The TVPRA prohibits Defendants from engaging in any venture they know or should know involves trafficking, and thereby establishes a non-delegable duty of reasonable care to detect and avoid participation in and benefiting from what they know or should know involves a trafficking venture.

38.    Countless research, news, and nonprofits have confirmed the "obvious nexus" between human trafficking and the hotel industry, which plays the crucial role of providing the venue to harbor and force victims to engage in commercial sex.[13]

---

[12] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.
[13] Brittany Anthony, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking,* Hotels and Motels, POLARIS 16-23 (Jul. 2018) https://polarisproject.org/wp-

39.     An overwhelming majority of commercial sex trafficking transactions occur within hotels and motels, as traffickers use their rooms as the hub for their operations.[14] Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.

40.     Hotels offer anonymity, non-traceability, privacy, and discretion making them ideal venues for crime and, in particular, sex trafficking. In addition, "buyers" purchasing people for sex, typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

41.     As part of their conspiracy, to save costs and continually reap millions of dollars in profits, Defendants generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding human trafficking (or suspected) at the branded properties. Furthermore, Defendants did not train staff on how to identify and respond to suspected human trafficking; failed to require training of all employees on human trafficking policies and procedures; failed to conduct audits confirming compliance with policies and procedures.

42.     Defendants kept no reports or data on suspected incidences or occurrences of human trafficking on their properties, the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures, and the number of rooms that Defendants refused to rent or refunded as a result of identifying the venture as one engaged in trafficking. Defendants did not establish a mandatory and secure reporting mechanisms for trafficking incidences at the point of sale.

---

content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf; *see also Hotels & Motels Recommendations*, POLARIS https://polarisproject.org/hotels-motels-recommendations; Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/ honorstheses/3.

[14] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754 .

43.     With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like R.C. to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' branded properties. Everyday victims of human trafficking like R.C. are repeatedly exploited within the rooms of Defendants branded properties across the country.

44.     Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

45.     Defendants are jointly and severally liable for the Plaintiff's damages in this case

**THE SEX TRAFFICKING OF PLAINTIFF R.C.**

46.     Plaintiff met her traffickers when she was 31 years old.

47.     By means of a combination of force, coercion, violence, threats, manipulation, compelled us of and dependency on illegal substances, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, R.C. was held captive and sold for sex by her traffickers approximately from 2010 to 2013.

48.     During the time that she was trafficked, R.C.'s traffickers frequently rented rooms at the Defendants locations because such rooms provided convenient, anonymous, and relatively central locations to which they could invite "johns" for the purpose of forcing R.C. to have sex with those "johns" for money.

49.     Throughout her trafficking, R.C.'s traffickers connected with "johns" willing to abuse R.C. for money by posting or causing to be posted entries on Backpage advertising for R.C.'s availability for commercial sex.

50.     Day after day, R.C. was sold and forced to perform sexual acts with multiple "johns" in a single night at Defendants hotels. If R.C. didn't make enough money, her traffickers would violently beat, sexually abuse, and/or point weapons at her.

51.     Over the course of a grueling three years, while under the coercive control of traffickers and "johns", R.C.'s traffickers rented rooms at, and forced her to have sex for money within, at least the following hotels:

      a.  Econolodge by Choice at 79 Rothrock Rd, Akron, OH 44321; and

      b.  Holiday Inn Express & Suites by IHG Defendants at 898 Arlington Ridge E, Akron, OH 44312.

52.     During the time she was trafficked, R.C.'s traffickers constantly shuffled her back and forth among hotels, often visiting the same hotels repeatedly at intervals, including the hotels listed above.

53.     During her captivity at Defendants' hotels, including the above listed locations, R.C. was subjected to rape, frequent physical and verbal abuse, malnourishment, psychological torment, kidnapping, and false imprisonment permitted by Defendants' brand hotel employees and managers.

54.     At the above listed hotels, R.C. encountered the same staff on multiple occasions. Defendants' staff would have seen the signs of R.C.'s deterioration brought on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring in public areas of Defendants' hotels.

55.     Traffickers of R.C. followed a repetitive and routine procedure during stays at the Defendants' hotels to which Defendants' hotels knew or should have known of R.C.'s trafficking because of a variety of factors detailed below:

## THE SEX TRAFFICKING OF R.C. AT THE ECONOLODGE BY CHOICE

56.     Starting in 2010, Plaintiff R.C. was subjected to sex trafficking at the Choice branded Econolodge hotel located at 79 Rothrock Rd, Akron, OH 44321 when she was 31 years old.

57.     For approximately three years, Plaintiff's traffickers rotated weeks at a time at this location, encountering the same staff. Plaintiff's traffickers were constantly having both physical and verbal fights in the room and in public areas throughout the hotel.

58.     Further, with each stay at the Econolodge by Choice, it resulted in several consistent red flags, including, but not limited to: paying for stays in cash; paying for extended stays on a day-by-day basis; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large numbers of used condoms left in the trash; unusually large number of male visitors asking for R.C. or her traffickers at the front desk; unusually large number of male visitors going in and out of R.C.'s room; physical abuse in public spaces; visible signs of prior/private physical abuse; asking the front desk not to be disturbed; and loud noises of abuse or other violence audible to staff and/or other rooms.

59.     There would be constant yelling and fighting between the traffickers, johns and R.C. coming from the room at the Econolodge. Police were called to this location numerous times because of noise complaints and drug usage and still nothing was done by Defendants to stop the traffickers.

60.     Plaintiff was repeatedly raped and otherwise sexually abused thousands and thousands of times at the Econolodge by Choice.

## THE SEX TRAFFICKING OF R.C. AT THE HOLIDAY INN BY IHG

14

61.     Starting in 2010, Plaintiff R.C. was subjected to sex trafficking at the Holiday Inn by IHG Defendants located at 898 Arlington Ridge E, Akron, OH 44312 when she was 31 years old.

62.     For approximately three years, Plaintiff's traffickers rotated weeks at a time at this location, encountering the same staff. Plaintiff's traffickers were constantly having verbal fights with R.C. in the parking lots, constant yelling in the room, and violence in the room and in public areas throughout the hotel.

63.     Further, with each stay at the Holiday Inn by IHG Defendants, it resulted in several consistent red flags, including, but not limited to: paying for stays in cash; paying for extended stays on a day-by-day basis; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large numbers of used condoms left in the trash; unusually large number of male visitors asking for R.C. or her traffickers at the front desk; unusually large number of male visitors going in and out of R.C.'s room; physical abuse in public spaces; visible signs of prior/private physical abuse; asking the front desk not to be disturbed; and loud noises of abuse or other violence audible to staff and/or other rooms.

64.     There was constant yelling and fighting between the traffickers, johns and R.C. coming from the room at the Holiday Inn. Police were called to this location numerous times because of noise complaints and drug usage and still nothing was done by Defendants to stop the traffickers.

65.     Plaintiff was repeatedly raped and otherwise sexually abused thousands and thousands of times at the Holiday Inn.

66.     These red flags were open and obvious to anyone working at the Holiday Inn by IHG Defendants and lasted continuously for three years.

15

**DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR LOCATIONS**

67.    Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[15] The United Nations,[16] international non-profits,[17] and the U.S. Department of Homeland Security,[18] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.

68.    For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

---

[15] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[16] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[17] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[18] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

69. Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[19] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[20] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

70. The Defendants, on information and belief, have access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. The Defendants nevertheless do not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

71. The Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

72. The Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

---

[19] *The Blue Heart Campaign,* UNITED NATIONS (2022),
https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heino us%20crime.
[20] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015),
https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

73.     A brief examination of just a handful of examples for each Defendant suffices to show the extraordinary frequency with which the Defendants have long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations:

**CHOICE**

a.  Regarding a stay in November 2019 at the Econolodge by Choice where R.C. was trafficked, a hotel customer wrote a review saying, "This doesn't even deserve 1 star in ma book. The rooms are clean the bathroom...yes. The toilet wobbles when your using it the shower floor creaks real loud like it's about fall in. I would not recommend this Hotel to anyone in Fairlawn, Ohio. Unless you are paying for an escort."

b.  Regarding another stay in November 2019 at the Econolodge by Choice where R.C. was trafficked, a hotel customer wrote a review saying, "This place is only suitable for crackheads and hookers. Room smelled and was dirty. Bedding had holes in it. They gave me no towels or wash clothes. They then charged my card an extra thirty dollars. The juice in the morning smelled like chemicals and burned our throats. It was a horrible experience."

c.  Regarding another stay in December 2021 at the Econolodge by Choice where R.C. was trafficked, a hotel customer wrote a review saying, "You could hear everything in the rooms around us and nights 1&2 of our 3 night stay, it sounded like someone was being beaten and murdered in the room above us. There was furniture banging and being tossed around for hours as well as running, screaming, yelling and crying at very loud decibels. We were ready to call the police and then it went quiet for a

couple hours before starting back up again. Second night it was even worse and eventually took to the corridors. Then it went silent so don't know if they got kicked out or the police came...at least night 3 was quieter."

### IHG

a. Regarding a stay at a Holiday Inn in Cleveland, Ohio in June 2018, a hotel customer wrote, "Worst Hotel**:** The worst hotel experience I have had in decades. It is very surprising because it was 250 plus a night and there are pretty high ratings on TripAdvisor. It makes no sense. Hotel obviously taking advantage of people who need to be downtown for the attractions. The crowd in the lobby and in front of the hotel could not be seedier. The street below is too noisy. The check-in is weird - you have to go down a long corridor. The elevators - near impossible to figure out how to put card in. The HVAC in the room is incredibly (!) loud and their moving us to another room solved nothing. (Probably the most important problem because sleep is obviously the key. What about the Holiday Inn Express commercials?) My 12-year-old son wanted to change hotels because the place is gross and weird.**"**

b. Regarding another stay at a holiday Inn in Cleveland-Mayfield, Ohio in April 2018, a hotel customer wrote, "Red flags go off when you check in to what you think is a nicer quality hotel. . . Is drug trafficking a problem here or something? . . . At that place they told me the reason was because there's been trouble with drugs at the motel and the police kept tabs on who stayed

there. This Holiday Inn said it was because the local police do sweeps of their lot. Why? What is going on at your hotel?"

**DEFENDANTS FACILITATED THE TRAFFICKING OF R.C.**

74.      Each Defendant is a signatory of the Code[21] and thereby have promised to adopt these policies to combat trafficking. Yet, Defendants have failed to implement most, if not all of these policies.

75.      Defendant Choice is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Choice publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Choice should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

76.      Defendant IHG is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and IHG publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, IHG should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

77.      Defendants profited from the sex trafficking of Plaintiff R.C. Defendants rented rooms to R.C.'s traffickers when they knew, or should have known, that human trafficking was prevalent within their branded properties and at the specific locations where R.C. was trafficked. The hotel staff, especially front desk staff, at Defendants properties knew or should have known of the obvious signs of R.C.'s trafficking.

---

[21] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

78. Defendants benefited from the steady stream of income that R.C.'s traffickers and "johns" bring to their hotel brands. Defendants profited from each and every room that R.C.'s traffickers and customers rented.

79. Defendants have made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Defendants should have been aware of human trafficking occurring at the locations where R.C. was trafficked given Defendants access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

80. Moreover, Defendants repeatedly collected data on R.C., her traffickers, and her "johns" from her many stays at Defendants hotels, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Defendant's employees witnessed the obvious signs of R.C.'s trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, Defendants failed to take reasonable measures to stop sex trafficking from occurring in their hotels. If Defendants would have taken proper measures, R.C. and other victims like her, would not have been trafficked at their locations.

81. Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to prevent sexual exploitation on their properties. Defendants maintained their deficiencies to maximize profits by:

> a. Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

b. Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

c. Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d. Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e. Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f. Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g. Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

82.     As a direct and proximate result of these egregious practices on the part of the Defendant Hotels, R.C. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**DEFENDANTS CONTROL OVER THEIR HOTEL LOCATIONS**

83.     Upon information and belief, it is standard practice in the hospitality industry, followed by all Defendants, for parent companies to set exacting brand quality standards reaching

everything from the temperature at which coffee shall be served to the number of pillows that shall be placed on each bed, types of funds accepted, and when, where, and how guests should be greeted.

84. The Defendants provide to their branded properties signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the parent hotel brand. The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

85. Defendants provide their branded properties branded name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online travel agency databases, as well as hotel locations with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Thus, booking and room reservations are to a large extent controlled by the Defendants.

86. Upon information and belief, per the relevant franchise agreements, the Defendants may enforce their brand standards by means of periodic inspections of hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

87. Upon information and belief, the Defendants' brand standards are so strict as to bar entirely certain efforts to combat trafficking, for instance by prohibiting the prominent placement of informational signs within hotel rooms offering to help victims escape.

88. It is further a standard practice in the hospitality industry, upon information and belief, followed by all Defendants, for parent companies to exercise significant control over the employment decisions of their hotel locations.

89. The Defendants and their hotel locations exhibit a significant degree of interrelated, intermingled, and unified operations at the locations at which Plaintiff was trafficked. Upon

information and belief, the Defendants promulgate policies, procedures, and standards governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay, which together exert significant control over all employment decisions made at the individual hotel locations at which Plaintiff was trafficked.

90.     On information and belief, the Defendants utilize some of these funds to monitor the brand standards and to offer training to hotel operators and franchisees.

91.     Under federal labor regulations, the Defendants are each considered joint employers of the employees at their locations at which Plaintiff was trafficked.

92.     Specifically, the Defendants control the creation and promulgation of policies relating to training employees to recognize and respond to human trafficking, and the Defendants determine whether such training shall be mandatory.

93.     Despite their knowledge that few, if any, employees at their hotel locations actually receive trainings if the same are not mandated, the Defendants have failed to mandate such training on any significant scale or at the specific locations where Plaintiff was trafficked.

94.     On information and belief, the Defendants require their hotel locations to pay approximately 10% of gross revenue back to the Defendants for the privilege of using the Defendants' names and following their brand standards.

## **CAUSE OF ACTION**

### **COUNT 1: 18 U.S.C. § 1595 ("TVPRA")**
#### (AGAINST ALL DEFENDANTS)

95.     Plaintiff incorporates each foregoing allegation.

96.     Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

97.     Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating human trafficking through their participation in the harboring of Plaintiff and her traffickers for the purposes of commercial sex induced by force, fraud, or coercion.

98.     Defendants have benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, Defendants directly benefitted from the sex trafficking of Plaintiff. The actions, omissions, and/or commissions alleged in this pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages.

99.     Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels and properties.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.  Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.  Disgorgement of profits obtained through unjust enrichment;

25

c.  Restitution;

d.  Statutory and/or treble damages, where available;

e.  Punitive damages;

f.  Attorneys' fees and expenses;

g.  The costs of this action;

h.  Pre- and post-judgment interest; and

i.  Any other relief the Court or jury deems appropriate.

## **JURY DEMAND**

Plaintiff hereby demands a trial by struck jury.

Dated: July 5, 2022

Respectfully submitted,

*/s/ Steven C. Babin, Jr.*
Steven C. Babin, Jr. (0093584)
Jennifer J. El-Kadi (00100660)
Kristina Aiad-Toss (0101336)
**Babin Law, LLC**
65 East State Street, Suite 1300
Columbus, Ohio 43215
T: 614-761-8800
E: steven.babin@babinlaws.com /
Jennifer.elkadi@babinlaws.com /
Kristina.aiad-toss@babinlaws.com

26